UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Care Realty, LLC; and
THCI Company, LLC,
    Plaintiffs

    v.                                    Case No. 10-cv-95-SM
                                          Opinion No. 2012 DNH 061
Lakeview Neurorehabilitation
Center, Inc.; Lakeview
Management, Inc.; and
Lakeview Neurorehab
Center Midwest, Inc.,
    Defendants


**O R D E R**

This suit was brought to resolve an issue left unaddressed in earlier litigation between the parties. See Lakeview Mgmt., Inc. v. Care Realty, LLC, Case No. 07-cv-303-SM. In the earlier suit, the court determined that the defendants (collectively referred to as "Lakeview") effectively exercised an option to extend commercial leases on neurorehabilitative facilities it operated in New Hampshire and Wisconsin.[1] The court also found that plaintiff ("THCI") behaved inequitably and breached its contractual obligation of good faith and fair dealing under the lease, such that THCI was estopped from invoking a default provision in the lease that otherwise might have precluded

---

[1] The Amended Leases at issue are interrelated and identical in every material respect. For ease of reference, the parties, leases, and facilities will be referred to as if there is a single plaintiff, defendant, and lease.

Lakeview's ability to extend the lease term.  The parties now return to resolve a dispute about the applicable "Base Rent" owed under the lease during the extended term.

The case was tried to the court on two claims related to determining the applicable Base Rent (Count I, seeking a declaratory judgment, and Count II seeking specific performance) while the remaining claims (related to damages) were reserved for future resolution, if necessary.

**Pertinent Facts**

An extended recitation of facts previously found relevant to this overall dispute appears in the court's decision in the earlier case.[2]  That factual record provides context for this dispute, but the discussion here will focus on those facts critical to resolving the pending issue - determining the applicable Base Rent.

THCI purchased the leased premises and assumed the original lessor's rights and obligations under the lease.  After gaining some experience administering the lease, THCI thought Lakeview was improperly calculating one of the components of the total

---

[2] Lakeview Mgmt., Inc. v. Care Realty, LLC, 2009 WL 903818 (D.N.H. March 30, 2009).

rent due - referred to in the lease as "Additional Rent."  THCI so informed Lakeview, but Lakeview disagreed, contending that the formula it was using to calculate Additional Rent was correct (based upon a definitional modification alleged to have been agreed to by the prior landlord, before THCI acquired the property).  THCI did not formally press the matter and did not notice a default under the lease.  Rather, it sat on its claim, intending to bring it up only if Lakeview attempted to exercise its option to extend the lease term (or after the period in which Lakeview was required to exercise its option expired).  That is, THCI determined not to put Lakeview on notice of a default condition, at least not in a way that would permit Lakeview to either cure the default or seek legal relief (to determine whether a default condition actually existed), in time to exercise its renewal option.

   The lease was for a "Fixed Term" of ten years, terminating on September 30, 2007, but subject to Lakeview's unilateral right to extend the term for three successive periods of five years each.  Lakeview could exercise its option to extend the term by giving THCI written notice "of each such extension" within a defined time window - at least 180 days, but not more than 360 days, before expiration of the Fixed Term (or an extended term if the option had previously been exercised).  Lakeview's option

rights are set out in Article 1.4 of the lease, which provides, in pertinent part:

> During each effective Extended Term, all of the terms and conditions of this Lease shall continue in full force and effect, except that the <u>Base Rent for each such Extended Term shall be the greater of (a) the fair market value rent for the Leased Property performed by an appraiser mutually acceptable to the Lessor and the Lessee</u>, as of the first day of each of the Extended Terms <u>or</u> (b) <u>The Base Rent in effect immediately prior to the expiration of the preceding term</u>.  <u>Said Base Rent shall be determined concurrently with the Lessee's giving of the Extension Notice to the Lessor</u>.
> (emphasis added)

As the matter stands, then, Lakeview validly exercised its option to extend the lease term on March 16, 2007, within the described window.  THCI will not be heard to argue that the lease could not be extended, or was not extended, because a default had "occurred and was continuing."  (Article 1.4)  That issue was resolved against THCI in the earlier litigation.

In this litigation, the parties are at odds with respect to what Base Rent applies during the extension period.  Lakeview says the Base Rent is equivalent to the Base Rent in effect immediately prior to expiration of the preceding term.  THCI, on the other hand, claims that the appraisal process referred to in Article 1.4 must be completed before the Base Rent can be determined, since the Base Rent "shall be" the "greater of" fair

market value rent as determined by a mutually agreed upon appraiser, or the preceding term's Base Rent.

## Discussion

A lease is construed in accordance with familiar principles applicable to contract construction. Interpretation of a lease is ultimately a question of law for the court, and the intent of the parties to a lease is generally determined from the plain meaning of the language used and the lease as a whole. See generally J.G.M.C.J. Corp. v. Sears, Roebuck & Co., 391 F.3d 364, 368 (1st Cir. 2004) (citing cases). The applicable provisions of Article 1.4 are generally straightforward. The Base Rent due during an extended term is the greater of:

a)  "The fair market value rent,"

   "to be determined by an appraisal,"

   "performed by an appraiser mutually acceptable to the Lessor and Lessee."

   or

b)  "the Base Rent in effect immediately prior to the expiration of the preceding term"

   and

c)  "Said Base Rent shall be determined concurrently with the Lessee's giving of the Extension Notice to the Lessor." (emphasis added)

Ordinarily, one would expect that, within a reasonable time after Lakeview gave notice of its exercise of the option to extend the lease term (March 16, 2007), the parties would have had a discussion about either continuing the current Base Rent into the extended term, or arranging for a mutually acceptable appraiser to generate an appraisal to set the "fair market value rent," so a comparison could be made and the "greater" amount determined.  That did not happen, of course, and it is clear why it did not happen.

To be sure, the parties' strained relationship, and THCI's penchant for obfuscation and avoidance muddied the factual waters.  Nevertheless, it is clear, and I so find, that THCI's disregard of its contractual duties of good faith and fair dealing, and its bad faith, animated its conduct from the time it decided to refrain from giving Lakeview notice of the claimed default condition until litigation began in the Fall of 2007.  THCI was determined not to proceed under the existing contractual terms and endeavored to thwart Lakeview's exercise of its option to extend the lease term.  THCI was committed to restructuring the relationship with Lakeview on decidedly more favorable terms, or replacing Lakeview altogether.  It had no interest in extending the then current lease, and no intent to acknowledge,

even contingently, that the option to extend had been validly exercised.

Lakeview exercised its option to extend the term, but THCI, for reasons satisfactory to it, determined to follow a course of action completely divorced from that called for under the lease. First, it adopted the view, incorrectly as it turns out, that it had succeeded in defeating the lease extension by invoking the Additional Rent default <u>after</u> the option period expired. But, rather than declare the lease terminated as of the impending expiration date, it merely "reserved its rights." <u>Lakeview</u>, 2009 WL 903818 at *15. THCI then intentionally refused to address the lease provisions related to setting the Base Rent for the extended term. THCI took the position that Lakeview was required to enter into an entirely new contractual arrangement, or there would be no relationship.

Lakeview, for its part, also hoped for a new agreement, but one more favorable to it then the current arrangement. As it became increasingly clear after April of 2007 that THCI had no intention of modifying the existing lease terms in a way more to Lakeview's liking, and was actually insisting upon an entirely new lease, Lakeview requested that the appraisal process contemplated by the lease be carried out:

> ". . . we need to move on getting fair market real
> estate appraisals.  We had hoped that we could avoid
> the costly appraisal step.  We have identified the
> certified appraisers in both areas [NH and WI] and if
> you could identify 5 that we could choose from we
> should have a mutually agreed upon appraiser, attached
> is the list,"

Ex. L875, Email from McDermott (Lakeview) to Torzelli (THCI), dated May 2, 2007.  That email plainly invoked the Article 1.4 appraisal process.  McDermott referred to the need to get an appraisal, to the "appraisal step" as a costly preexisting obligation it hoped to avoid, and to the requirement that the appraiser be "mutually agreed upon" - all of which tracks the language of Article 1.4.  THCI understood that Lakeview was invoking the Article 1.4 appraisal process for the purpose of setting the Base Rent for the first extended term.  As THCI concedes, it "did not accept [Lakeview's] invitation to conduct a fair market appraisal as set forth in [the] email."  THCI's Post-Trial Memorandum (document no. 60) at 8.  Subsequently, in June of 2007, Lakeview again sought to have THCI cooperate in having an appraisal done, and again THCI refused.

On August 30, 2007, as expiration of the original term and commencement of the extended term approached, Lakeview, through counsel, put THCI on formal notice that it would pay the current Base Rate in the extended term:

> [Lakeview] previously requested [THCI's] cooperation in
> selecting an appraiser to identify the current market
> value of the Lease.  To date, [THCI] has not responded
> to [Lakeview's] requests.  Accordingly, unless or until
> [Lakeview] receives a timely and appropriate response
> to these requests it shall continue payment of the
> current Base Rent.

Ex. 3F.  THCI, as was its apparent custom, did not respond.

The Base Rent adjustment provisions in Article 1.4 are reasonably clear.  The language contemplates that Base Rent during an extended term will either remain the same as in the previous term or increase, if a fair market appraisal, performed by an appraiser mutually agreed upon by the parties, supports a higher rate.  In no event will the extended term's Base Rent be <u>less</u> than the current term's Base Rent.  Therefore, since the Base Rent can only <u>increase</u> as a result of the appraisal process, that process can only benefit the lessor - THCI.

Here, THCI consciously decided not to avail itself of that process, preferring instead to assume (or posture) that it was no longer bound by the lease terms, because that position better facilitated its demand that Lakeview agree to completely different terms.  That position was consistent, as well, with its intent not to continue under the existing lease unless compelled to do so.  Not only did THCI not invoke the appraisal process

that could only benefit THCI, but when the <u>lessee</u> sought to have an appraisal done (which could only <u>increase</u> the Base Rent), THCI still refused.  THCI's argument to the effect that it wished to avoid the costs of an appraisal while negotiating new terms rings hollow - THCI never communicated that thought to Lakeview, and no internal THCI documents support it.  Why THCI refused to acknowledge or cooperate in the appraisal process is evident - it simply was not interested in determining a fair market rate adjustment in the context of the existing lease.  It wanted a completely new deal, at a substantially higher rental rate, without regard to what an appraised fair market value might support.

THCI was perfectly willing to ignore the existing lease, or perfectly willing to bank exclusively on the validity of its own conclusion that the existing lease term had not been extended and so it was relieved of its lease obligations with respect to an extended term.  That position was, of course, based upon its earlier inequitable conduct - THCI thought it had gotten away with its "trump" of Lakeview's right to exercise the option to extend.  <u>See</u> Ex. L000754.  And, that position was wrong.

Needless to say, perhaps, but THCI cannot be heard to complain about the absence of a fair market appraisal where the

lease it spurned provided for one, and when it could very well have had one for the asking, but neither asked, nor agreed to cooperate in that process when Lakeview asked.  THCI staked out its ground when it behaved inequitably, when it declined to invoke the appraisal process itself, and when it refused the appraisal process when it was offered.  Demanding that process only after its rascality was established, its conclusions exposed as erroneous, and well beyond any period that might conceivably be called "contemporaneous" with Lakeview's exercise of the option to extend, is of course a meritless demand.

    Although extensively discussed by the parties, resolution of this dispute does not turn on whether THCI "waived" or "forfeited" its right to invoke the appraisal process - at least not in the classic sense.  Nothing in Article 1.4 suggests that an appraisal is <u>required</u>.  Whether an appraisal is done or not done is a matter committed, as a practical and common sense matter, to the discretion of the lessor, THCI.  Because only THCI stands to benefit from an appraisal relative to setting an extended term's Base Rent, and because such appraisals are not inexpensive, THCI surely could not, under the provision, be <u>forced</u> to undertake such a costly endeavor.  That would be particularly so under circumstances in which THCI considered the

current Base Rate not only satisfactory, but undoubtedly higher than a fair market value appraisal might justify.

The parties' intent is manifested by the plain meaning of the escalation language used in Article 1.4, and that intent is clear - the lessor is entitled to a Base Rate increase during an extended term if a fair market appraisal, performed by a mutually agreed-upon appraiser, supports a higher rate which is determined concurrently with the lessee's notice of extension.  But, the lessor is not required to, and cannot be compelled to complete the process if the lessor is satisfied with the then-current Base Rent amount.  Article 1.4 permits the lessor to exercise its own judgment about its own interests, and to decide <u>not</u> to exercise its option to incur substantial costs associated with an appraisal of doubtful potential value.  Indeed, the lessor may exercise its discretion not to undergo an appraisal process for any reason at all.  Making such a decision is not properly described as a "waiver" or "forfeiture," but rather, an election.

Judge (and Professor) Keeton explained the dispositive legal point in <u>Taylor v. Marsh</u>, 624 F. Supp. 1042 (D. Ma. 1985):

> A waiver is the intentional relinquishment of a known right.

\* \* \*

> Professor John Ewart in his writings on the distinction between waiver and election identified election as the choice of one of two or more courses each of which has distinct legal consequences. J. Ewart, <u>Waiver Distributed Among the Departments: Election, Estoppel, Contract, Release</u>, 7-9, 84-87 (with an Introduction by Roscoe Pound 1917). Having chosen a particular course, a party is then foreclosed from pursuing any other course, even if at the time of his choice the party was not aware of the consequences.
>
> Professor Ewart explained this aspect of election, that a party is bound by the consequences of his choice even though he may not have known them at the time the choice was made, by means of the following example:
>
>> we may take as illustrative . . . the case of a landlord who knew that a sub-lease had been executed but was unaware that, for that reason, he had a right to elect to terminate the lease. If under those circumstances he should receive, or demand, or distrain for rent subsequently falling due, he would be held to have elected to continue the tenancy; and his election would be irreversible notwithstanding his lack of knowledge.
>
> <u>Id</u>. at 75. <u>See also</u> <u>id</u>. at 85-86.
>
> Although courts have not adopted Professor Ewart's terminology, his observation that waiver has been used in very different senses is apt. Some confusion, which may have affected the course of the present litigation, may be avoided by distinguishing between "waiver" in the sense of "voluntary relinquishment of known right" ("strict waiver") and "waiver" in the sense that Professor Ewart calls "election" ("waiver by election").

<u>Id</u>. at 1044-45.

That is precisely what THCI did - it elected, for reasons satisfactory to itself, to follow a different course and not obtain an appraisal in accordance with Article 1.4. It was not

13

contractually obligated to obtain an appraisal, and failing to do so visited no harm on the lessee.  After all, the lessee can hardly complain about not being exposed to a process that could only result in maintaining or increasing the current rent structure.

Whether THCI's reasons for following another course were ill-advised, erroneous, contrary to its own economic interests, or a consequence of its own misconduct or ignorance, is no more relevant than if those reasons were sound, justified and consistent with principles of good faith.  It matters only that THCI, for reasons satisfactory to it, made the decision to follow that course (declining the appraisal process), and that it was not misled or wrongly induced to do so (it was not).

Having chosen its course, having decided to ignore the appraisal process provision after Lakeview exercised its option, having decided to bank on its own conclusions about the legal enforceability of that option exercise, and having decided to pursue an effort to obtain a restructuring of the commercial relationship completely divorced from the existing lease, THCI is foreclosed from revisiting those choices and making different ones now.  Indeed, as a practical matter, THCI was likely foreclosed well before October 1, 2007, when the extended term

began, for at least two reasons beyond the fact that it declined the appraisal process in May and June: 1) an appraisal process begun in September would not likely allow for a determination of Base Rent "concurrently" with Lakeview's March notice of extension; and 2) by that time, Lakeview undoubtedly was prejudiced by THCI's failure to invoke or participate in the appraisal process, and/or its indifference to the process.  As Ms. McDermott testified, these neurorehabilitative institutions are highly regulated and complex operations.  Fundamental costs, like Base Rent, must be determined in a timely manner to allow other fiscal adjustments that are dependent in myriad ways on that Base Rent (e.g., budgeted public reimbursement rates), all of which is critical to the continued delivery of medical care to needy patients.

## Conclusion

For the above reasons, judgment shall enter in favor of defendants on Count I (Declaratory Judgment) and Count III (Breach of Contract - Specific Performance).  Counts II, IV, and V all relate to damages claims that are dependent upon success on Counts I or III.  Accordingly, those claims are dismissed.  This decision shall constitute the court's findings of fact and rulings of law.  Fed. R. Civ. P. 52(a)(1).  If either party believes this decision leaves specific, and pertinent, requests

for findings of fact or rulings of law unaddressed, that party may, by pleading filed within fourteen (14) days of the date of this order, identify those specific requests and specific rulings will be issued.

    **SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 29, 2012

cc:   Kristen R. Blanchette, Esq.
      Christopher H. M. Carter, Esq.
      Daniel M. Deschenes, Esq.
      Ovide M. Lamontagne, Esq.
      Jonathan M. Shirley, Esq.
      Daniel E. Will, Esq.
      Leigh S. Willey, Esq.